IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

BRUCE D.,

        **Plaintiff,**

  v.                                 Civil Action 3:25–cv–116
                                       Judge Michael J. Newman
                                       Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Bruce D., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff protectively filed his application for SSI on August 22, 2016, alleging that he was disabled beginning March 19, 2010, due to back problems, depression, arthritis, migraine, anxiety, knee problems, and blurred vision. (R. at 241–46, 271). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") heard the matter on December 19, 2018. (R. at 44–72). Ultimately, the ALJ denied benefits in a written decision on February 26, 2019. (R. at 12–43).

After the Appeals Council denied review, Plaintiff filed a case in the United States District Court for the Southern District of Ohio. This Court remanded the case to the Commissioner. *See [Bruce D.] v. Comm'r of Soc. Sec.*, No. 3:20−cv−218 (S.D. Ohio June 9, 2022). (R. at 1115–26).

This matter was remanded by the Appeals Council on July 3, 2022. (R. at 1127–31). Upon remand, ALJ Stuart Adkins held a subsequent hearing via telephone on April 10, 2023 (R. at 1045−76), and issued a decision denying Plaintiff's application for benefits. (R. at 1003–44).

After the Appeals Council denied review, Plaintiff filed suit with this Court on April 17, 2025 (Doc. 1), and the Commissioner filed the administrative record on June 16, 2025 (Doc. 7). The matter has been briefed and is ripe for consideration. (Docs. 8, 12, 14).

A. **Relevant Statements to the Agency and Hearing Testimony**

The ALJ summarized Plaintiff's hearing testimony as well as his statements to the agency regarding his mental impairments as follows:

> *** [Plaintiff] stated that his depression and anxiety caused him to not want to do anything, and he went eleven days without a shower (Exhibit C3A/6). He had panic attacks where it felt like he could not breathe and everything was closing in on him, and those episodes lasted about half an hour (Exhibit C3A/6). He noted that he was unable to get a restful sleep, and he suggested that he was forgetful (Exhibit C3A/6). He noted that he attended to his own self–care, though he did not do any chores (Exhibit C3A/6). Once or twice per month, he visited with friends and family (Exhibit C3A/6). On appeal, he noted that *** his depression caused him to stay in his house for three weeks (Exhibit C4E/2). He also noted he sleeps all the time (Exhibit C4E/2). In a February 2017 report of contact, [Plaintiff] *** stated it was harder to attend to his personal care, ***. He noted he had not been going out much (Exhibit C5A/7). He stated that he did not want to get out of bed and was leaving the house maybe once per week to go to the doctor (Exhibit C5A/8).

(R. at 1014).

The ALJ summarized Plaintiff's hearing testimony from the December 18, 2018 hearing regarding his mental impairments as follows:

> At the 2018 hearing, [Plaintiff] *** noted some anxiety while driving but overall indicated he had no difficulty doing so. He stated that his anxiety and depression made it difficult to go to the store or otherwise be around people. He noted that he completed tenth grade in a lot of special classes for learning disabilities, though he was able to read, write, and perform basic math. He reported that his gait was not great, and he napped for about an hour daily. He noted that he got his medication from his family doctor and had not participated in counseling for over

> a year because he had panic attacks while talking to people. He also stated that he has panic attacks when he goes out, particularly around crowds, and he has some days where it is hard to concentrate. He suggested that there were approximately twenty days per month where [Plaintiff] had bad depression.

(R. at 1014–15).

The ALJ summarized Plaintiff's hearing testimony from the April 10, 2023 hearing regarding his mental impairments as follows:

> At the 2023 hearing, [Plaintiff] testified that *** he had panic attacks triggered by pressure and being around others. He had them daily for fifteen minutes to two hours, depending on if he can get out of the situation. He sometimes got so panicked that he started crying. He indicated that he had past difficulty with coworkers and bosses, and he tried to stay away from others. He was participating in counseling every three weeks, and his counselor was trying to help with his self–esteem. He noted depressive symptoms of not showering for a week or more, and there were times where he will not go out of bed for a week. He stated that he got angry or sad and wanted to be in his room alone. He slept about six hours per night, and he sometimes took naps if feeling really depressed. He stated he had trouble focusing and concentrating, noting that his mind wanders, and his memory was worse. His mother testified that he had problems around others where he was nervous and started sweating. She also noted that his back pain interfered with past work. He spent most of his time in his room, and he did not help with chores or cooking. He had some crying spells when upset and overwhelmed, such as before the hearing. He also got shaky, breathed hard, and his voice will quiver when anxious. Such episodes occurred about ten times per month.

(R. at 1015).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's mental health impairments as follows:

> *** [Plaintiff] suggested that his depression and anxiety dates to around age eight or nine (Exhibit C13F/5). 2011 neurology notes reflect that [Plaintiff]'s depression was under poor control, and he had a history of suicidal ideation (Exhibit C15F/2). He complained of some involuntary head jerks, which his neurologist suspected was stress–induced, and aggressive depression treatment was recommended (Exhibit C15F/2). 2015 treatment notes indicate [Plaintiff] had been taking Prozac "for a long time" (Exhibit C5F/15). May 2015 neurology notes demonstrate that language, memory, fund of knowledge, attention span, and concentration were all within normal limits (Exhibit C2F/5). [Plaintiff] complained of increased depression and anxiety to his primary care physician in January 2016 (Exhibit C5F/13). He also reported that he was anxious in crowded places (Exhibit

3

C5F/13). Nevertheless, he presented with normal mood and affect (Exhibit C5F/12). February 2016 treatment notes show that his mood was unchanged, but he did not want to see a psychiatrist due to past reactions to medications (Exhibit C5F/10). August 2016 treatment notes suggest that [Plaintiff] was only eating once daily, and he stated that he wakes up at noon and stays up at the night (Exhibit C5F/8). [Plaintiff] began participating in therapy in September 2016 (Exhibit C13F/5). During his diagnostic assessment, [Plaintiff] complained of anxiety rated 10/10, noting he was constantly nervous with periodic panic attacks and anger, and he rated his depression at 8/10 (Exhibit C13F/5). Symptoms included low mood, loss of interest and motivation, and occasional crying spells, though he denied any suicidal ideation (Exhibit C13F/5). His mental status examination reflects that [Plaintiff] was moderately unkempt and presented with moderate depression and severe anxiety (Exhibit C13F/8). His mental status examination was otherwise normal with average demeanor, average eye contact, average activity, no delusions or other disturbances of thought content, no hallucinations or other disturbances of perception, logical thought processes, full affect, cooperative behavior, no impairment in cognition, above average intelligence, and no risk of harm (Exhibit C13F/8–9).

He was diagnosed with a generalized anxiety disorder (Exhibit C13F/10). By his October 2016 appointment, [Plaintiff]'s anxiety and depression were both reduced to 4/10, though he reported a lack of motivation to accomplish everything (Exhibit C13F/16). He noted that he does not do much to help out at home because his mother was a perfectionist when it came to household tasks (Exhibit C13F/16). His treatment notes through March 2017 continued to reflect that his depression and anxiety were only rated 4/10 (Exhibit C13F). ***

[Plaintiff] participated in a psychological consultative examination in December 2016 (Exhibit C9F). At the evaluation, [Plaintiff] reported that he was in a special class for reading and math, noting he always struggled with math (Exhibit C9F/3). He stated he normally kept to himself during past work, but he did not report any problems getting along with coworkers (Exhibit C9F/4). He stated that he had a crying spell every couple of weeks, he only ate about once per day, and he did not sleep well (Exhibit C9F/4). He endorsed symptoms of mood swings with anger, and he indicated he has been in screaming matches (Exhibit C9F/4). He reported suicidal thoughts "pretty often" and suggested he only had two days per month when he was happy (Exhibit C9F/4). He noted he acted on his suicidal thoughts one time, but he reported he would never commit suicide because it would destroy his mother (Exhibit C9F/4). He stated his energy level was low, he always felt tired, and he did not have interest in things (Exhibit C9F/4). He indicated there are a lot of days where he cannot decide what he wants to do or watch on television, so he just goes back to bed (Exhibit C9F/4). He reported he was "pretty much always nervous," but he only had panic attacks once or twice per month where it feels like everything is closing in and he wants to puke or lock himself in a room (Exhibit C9F/4). He indicated he was especially likely to get panicky if he was going to go out and has to talk to people, as he worries a lot about what others

think (Exhibit C9F/4). He suggested he forgets things such as what a television show was about, and he was more likely to forget when he was nervous (Exhibit C9F/4). He noted that his thoughts will go to something else when watching television or reading (Exhibit C9F/4). However, the examiner noted that [Plaintiff] did not display any outward signs of depression or anxiety (Exhibit C9F/5). He was clean and cooperative (Exhibit C9F/5). Speech was normal, and there was no indication of any delusions or hallucinations despite worrying about the opinion of others and expressing a general distrust of others (Exhibit C9F/5). During the examination, [Plaintiff] was able to recall three out of four objects after five minutes, and he remembered eight digits forward and three backward (Exhibit C9F/5). He was able to perform single digit addition, subtraction, multiplication, and division, though he had four subtraction errors on his serial 7s (Exhibit C9F/5). He had awareness of his health and emotional difficulties, and there did not appear to be any indications of problems with judgment in day–to–day life (Exhibit C9F/6). The examiner diagnosed [Plaintiff] with a generalized anxiety disorder and recurrent, moderate major depressive disorder (Exhibit C9F/6). ***

April 2017 treatment notes indicate [Plaintiff] had normal judgment, memory, mood, and affect (Exhibit C20F/47). His therapy notes demonstrate that [Plaintiff] was trying to get out a little more (Exhibit C35F/8). On some days, he woke up feeling good and optimistic, but those periods only last a couple of days (Exhibit C35F/8). [Plaintiff]'s therapy records reflect several missed appointments in May and July 2017, and it does not appear that he returned to therapy after angrily venting in June 2017 (Exhibit C35F/4). At the last therapy appointment with that provider, [Plaintiff] demonstrated concrete and rigid thinking, providing no recognition that there alternative ways of thinking and behaving (Exhibit C35F/4). He denied suicidal ideation, but he described himself as waiting to die (Exhibit C35F/4). Nevertheless, his mental status reflects no more than moderate abnormalities in thought process, mood, and behavior (Exhibit C35F/4). In August 2017, [Plaintiff] opted to continue on his current depression medications, and he did not want to consider other treatment options due problems with his prior counselor (Exhibit C20F/23). May 2018 orthopedic notes suggest that [Plaintiff]'s depression was contributing to his back pain, and they recommended following up with a psychiatrist (Exhibit C33F/7). His July 2018 PHQ–9 screening with his primary care provider indicated moderately severe depression (Exhibit C30F/48). September 2018 primary care notes showed anxiety and depression (Exhibit C30F/57). However, on examination, he had normal mood and affect (Exhibit C30F/58). In October 2019, [Plaintiff] participated in an intake session for a new therapist (Exhibit C45F/1). On examination, his mood was appropriate to topic while his affect was appropriately variable (Exhibit C45F/1). He had fleeting thoughts of suicidality, but suicidality and homicidality were not present (Exhibit C45F/1). He appeared mildly unkempt (Exhibit C45F/1). Motor activity was calm (Exhibit C45F/1). Speech was normal, thought processes were logical and goal–directed, and there were no hallucinations, delusions, or other abnormalities in thought content or perception (Exhibit C45F/1). He was cooperative with fair impulse control (Exhibit C45F/1). Concentration was adequate despite some

5

minor attention span abnormalities, though he was not considered distractible or in need of much repetition (Exhibit C45F/1). Memory and abstraction were intact, as was cognitive function, including general knowledge, serial sevens, and simple calculations (Exhibit C45F/1). Insight and judgment were intact (Exhibit C45F/1). He regularly participated in therapy through the end of the record (Exhibit C45F). Despite ongoing reports of symptomology, his therapy notes do not suggest significant abnormalities in cooperation, impulse control, concentration, attention, cognitive function, memory, abstraction, insight, and judgment (Exhibit C45F). ***

December 2019 primary care notes reflect that he liked his therapist and was more comfortable in talking about his issues (Exhibit C40F/94). January 2021 primary care notes show that his mood was the same, and he was reluctant to change his medication due to prior adverse reactions (Exhibit C40F/70). January 2023 primary care notes reflect that therapy helped in the past (Exhibit C40F/22). On examination, his mood was normal while his affect was flat (Exhibit C40F/22). In a March 2023 form, [Plaintiff]'s therapist indicated that he had signs and symptoms of poor memory, appetite disturbances, sleep disturbances, mood disturbances, emotional lability, delusions or hallucinations, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor retardation, difficulty thinking or concentrating, suicidal ideation or attempts, perceptual disturbances, some time or place disorientation, social withdrawal or isolation, decreased energy, manic syndrome, obsessions or compulsions, some intrusive recollections of traumatic experience, generalized persistent anxiety, irritability, and a blunt, flat, or inappropriate affect (Exhibit C46F/1). She also noted that [Plaintiff] reported worsening physical symptoms when depressed (Exhibit C46F/1). Nevertheless, despite his subjective complaints and mood abnormalities sometimes noted on examination, findings on mental status examinations consistently demonstrate better functioning than alleged with respect to cognition, memory, attention and concentration, insight, and judgment (Exhibits C1F–C48F). Furthermore, despite recommendations from several providers that he see a psychiatrist, his mental health medication was conservatively managed by his primary care provider with minimal changes (Exhibits C1F–C48F). ***

(R. at 1022–25).

### C. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since August 22, 2016, the application date. (R. at 1010). The ALJ determined that Plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine, arthritis, degenerative joint disease, osteoarthritis of the knees and ankles, migraines, myoclonus, obesity,

an adjustment disorder, a personality disorder, anxiety, and depression. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with lifting and/or carrying ten pounds occasionally and less than ten pounds frequently. [Plaintiff] is able to stand and/or walk for about two hours in an eight–hour workday, and he is able to sit for about six hours in an eight–hour workday. [Plaintiff] is able to frequently push and/or pull with the lower extremities. [Plaintiff] is limited to no climbing of ladders, ropes, or scaffolds with occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. [Plaintiff] is able to frequently handle, finger, and feel bilaterally. [Plaintiff] should avoid concentrated exposure to extreme cold and vibration, and he should avoid unprotected heights, dangerous machinery, and commercial driving. [Plaintiff] is able to perform simple, routine tasks but not at a production–rate pace and without strict performance quotas. [Plaintiff] is limited to occasional superficial contact with coworkers and supervisors with "superficial contact" defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice. [Plaintiff] is limited to no interaction with the general public and no jobs involving teamwork or tandem tasks. [Plaintiff] is able to tolerate occasional changes to a routine work setting defined as one to two per week.

(R. at 1013).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 1015).

Based on the vocational expert's testimony, the ALJ found that Plaintiff is unable to perform his past relevant work as a cleaner. (R. at 1032). Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform sedentary exertional, unskilled jobs that exist in significant numbers in the national economy, such as an ink printer, document preparer, or dial marker. (R. at 1033–34). He therefore concluded that Plaintiff "has not been under a

disability, as defined in the Social Security Act, since August 22, 2016, the date the application was filed (20 CFR 416.920(g))." (R. at 1034).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13–cv–1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff contends the ALJ failed to satisfy his regulatory responsibility by granting "partial weight" to "literally every medical opinion" without a sufficient accompanying explanation and by excluding certain limitations related to social functioning from Plaintiff's RFC. (Doc. 8 at 6).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R.

8

§ 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). An ALJ's "RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96–8p, 1996 WL 374184 at *7 (July 2, 1996).

For claims filed before March 27, 2017, the social security regulations recognize several types of medical sources: Treating physicians and psychologists, non-treating yet examining physicians and psychologists, and non-treating/record-reviewing physicians and psychologists. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats [Plaintiff] (a "treating source") is afforded more weight than that from a source who has examined [Plaintiff] but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Id.* (citations omitted). The regulations require an ALJ to "provide 'good reasons' for discounting the weight given to a treating-source opinion. *Id.* at 376 (citing 20 C.F.R. § 404.1527(c)(2)). On the other hand, the ALJ is not required to give "good reasons" for discounting the opinions of non-treating sources. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But

because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."). Nor is the ALJ "required to defer to such opinions of non-treating sources." *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)). Rather, ALJs "must only provide a meaningful explanation regarding the weight given to particular medical source opinions." *Id.* In the end, "opinions from nontreating and nonexamining sources" are weighed "based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)).

Plaintiff draws the Undersigned's attention to several medical opinions the ALJ considered: David L. Lauffenburger, M.A.; Irene Dirskend, PCC; and state agency psychologists Paul Tangeman, Ph.D. and Kristin Haskins, Psy.D. (*See generally* Doc. 8). Of the first two, Plaintiff claims that the ALJ "vaguely" and reversibly assigned "partial weight . . . without always clarifying which parts of the opinions are adopted, and which are rejected." (*Id.* at 6). Plaintiff also pushes back on the ALJ's rejection of Drs. Tangemen and Haskins' opinion that Plaintiff "would perform best in a solitary setting." (*Id.* at 7–8 (citing R. at 124, 144)). The Commissioner counters that the ALJ properly evaluated the opinion evidence, and that substantial evidence supports his conclusions.[1] (*See* Doc. 12 at 3–11). Ultimately, the Undersigned finds no reversible error.

---

[1] The Commissioner spends time also arguing the sufficiency of the ALJ's treatment of Dr. Alan R. Boerger's opinion. (Doc. 12 at 4). However, Plaintiff's statement of errors expressly mentions Dr. Boerger's opinion only in reference to additional support for a limitation related to a solitary work setting. (Doc. 8 at 8 (citing R. at 408)). Therefore, the Undersigned need not consider the ALJ's treatment of Dr. Boerger's opinion more generally. Any argument to the contrary would be unavailing. Though Plaintiff attempts to broadly assign error to the "ALJ [giving] essentially every opinion in the record 'partial weight'" and cites several pages of the ALJ's opinion—including the discussion of Dr. Boerger's findings—Plaintiff argues with particularity against the "partial weight" the ALJ gave to Mr. Lauffenburger's and Ms. Dirksend's opinions only. (Doc. 8 at 6–7). The Undersigned declines to read additional errors where Plaintiff has not provided specific development. *See, e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995–96

### A. David L. Lauffenburger's Opinion

The Undersigned first considers the ALJ's treatment of Mr. Lauffenburger's 2016 opinion. The ALJ began his assessment by noting that the opinion was not an acceptable medical source. (R. at 1029 (citing R. at 395–400)); *see also* 20 C.F.R. §§ 404.1502(a), 416.913(a). Plaintiff does not contest this categorization. (*See generally* Doc. 8). Under SSR 06-03p, then, Mr. Lauffenburger's opinion is considered an "other source." SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). Only acceptable medical sources can be considered as treating sources, can give medical opinions, and can establish the existence of a medically determinable impairment; but the regulations still require the ALJ to consider information from other sources. *Id.*; *see also Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). "This is not a demanding standard." *Miller v. Comm'r of Soc. Sec.*, No. 1:14-CV-1083, 2016 WL 1060357, at *10 (W.D. Mich. Mar. 14, 2016); *Hardiman v. Comm'r of Soc. Sec.*, No. 3:15-CV-1259, 2016 WL 11260322, at *12 (N.D. Ohio June 13, 2016) ("The requirement that an ALJ consider and explain the weight ascribed to an "other source" is not a demanding standard."), *report and recommendation adopted in part*, No. 3:15-CV-1259, 2017 WL 1352061 (N.D. Ohio Apr. 13, 2017). "Factors to be considered in evaluating opinions from 'other sources' who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment." *Simpson v. Comm'r of*

---

(6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

11

*Soc. Sec.*, No. 1:13-CV-640, 2014 WL 3845951, at *6 (S.D. Ohio Aug. 5, 2014) (citing 20 C.F.R. §§ 404.1502(a), 416.913(a)). However, not every factor will apply in every case. *Id.*

Here, the ALJ properly considered Mr. Lauffenburger's opinion in line with the regulations and gave it "partial, and not controlling or deferential, weight." (R. at 1029). The ALJ first considered that, at that time, Mr. Lauffenburger treated Plaintiff for only one month and it had been one month since he had seen Plaintiff when he completed the form. (*Id.* (citing R. at 395–401)). The ALJ then considered Mr. Lauffenburger's notes that Plaintiff's abilities to remember, understand, and follow directions, maintain attention, and sustain concentration were "impaired." (*Id.* (citing R. at 398)). The ALJ went on to say that Mr. Lauffenburger noted Plaintiff was "severely isolated and withdrawn," exhibited poor adaptability, and had difficulty reacting to pressure. (*Id.* (citing R. at 398)). The ALJ also considered, however, that Mr. Lauffenburger stated he was unable to complete the entire questionnaire due to lack of specific information. (*Id.* (citing R. at 400). The ALJ took this to "indicat[e] that [Mr. Lauffenburger] was relying on an uncritical acceptance of the [Plaintiff's] subjective allegations from limited meetings as opposed to objective findings and a longstanding treatment history." (*Id.* (citing R. at 400)). The ALJ also found that the opinion was vague and inconsistent with the record showing that Plaintiff was generally cooperative, demonstrated adequate cognitive abilities, and engaged in social activities. (*Id.* (citing *e.g.*, R. at 115, 136, 378, 406, 453, 460, 508)). In the end, the ALJ concluded that "the record does support finding some limitations, albeit not to the extent suggested by Mr. Lauffenburger." (*Id.*).

The ALJ's discussion of Mr. Lauffenburger's opinion complies with the regulations. The ALJ walked through Mr. Lauffenburger's conclusions; noted how long Plaintiff knew Mr. Lauffenburger and how frequently he saw him; evaluated how supported the opinion was by Mr.

Lauffenburger's explanations; and compared the opinion to other record evidence. After this, the ALJ assigned the opinion partial weight because the record supported some mental limitations but not as extreme as Mr. Lauffenburger suggested. This is more than adequate under the regulations. *See, e.g.*, *Miller*, 2016 WL 1060357, at *10; *Drain v. Comm'r of Soc. Sec.*, No. 14-CV-12036, 2015 WL 4603038, at *4 (E.D. Mich. July 30, 2015) ("So long as the ALJ addresses the opinion of [an other source] and gives reasons for crediting or not crediting the opinion, the ALJ has complied with the regulations."); *cf. Nash v. Comm'r of Soc. Sec.*, No. 3:18-CV-258-DJH-CHL, 2019 WL 4751554 (W.D. Ky. Sept. 30, 2019) (finding an ALJ's assignment of partial weight sufficient where she explained that the findings were based on subjective reports and not supported by other evidence in the record), *aff'd*, No. 19-6321, 2020 WL 6882255 (6th Cir. 2020).

Plaintiff has two primary qualms with the ALJ's analysis. The first is the ALJ's inference that because Mr. Lauffenburger said he was unable to complete the entire form, his opinion relied on an uncritical acceptance of Plaintiff's subjective allegations from limited meetings. (Doc. 8 at 7). According to Plaintiff, this inference is unreasonable because Mr. Lauffenburger's opinion included some clinical observations and did not state he relied only on subjective complaints rather than his own expertise. (*Id.*). Yet the ALJ was correct in noting the limited nature of Mr. Lauffenburger's opinion. (R. at 1029). Mr. Lauffenburger expressly stated he was unable to complete portions of the questionnaire related to Plaintiff's daily activities and work because he did not have "specific information." (R. at 400). And while Plaintiff focuses on the ALJ's inference about subjective complaints, that is not the only reason that the ALJ partially rejected Mr. Lauffenburger's opinion. As stated, the ALJ also noted limited treatment history, vagueness, and the opinion's inconsistency with the record as considerations. (R. at 1029). Though Plaintiff obviously wishes the ALJ came to a different conclusion about Mr. Lauffenburger's opinion, the

13

Undersigned is not obligated to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). Rather, "discretion is vested in the ALJ to weigh all the evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009). And here, the ALJ's subjective complaints inference is an exercise of that discretion—not reversible error.

Plaintiff's second issue with the ALJ's finding is that ALJ did not explain which parts of Mr. Lauffenburger's opinion he adopted and which he rejected. (Doc. 8 at 6–7). Yet it is not so obvious that the ALJ was under a regulatory obligation to specifically list which "limitations were given weight, and which were not adopted" as Plaintiff suggests. (*Id.* at 6). The solitary cases Plaintiff provides for this notion are *Sanders v. Comm'r of Soc. Sec.*, No. 1:13-CV-481, 2014 WL 3899288 (S.D. Ohio Aug. 11, 2014), and *Baskin v. Colvin*, No. 3:11-0948, 2013 WL 1149597 (M.D. Tenn. Mar. 19, 2013), *report and recommendation adopted*, No. 3:11-CV-0948, 2013 WL 1405962 (M.D. Tenn. Apr. 8, 2013). In *Sanders*, this Court was unable to reconcile that an ALJ wholly rejected a doctor's findings as unsupported while at the same time assigning "some weight" to her testimony in crafting the RFC. 2014 WL 3899288, at *11. The Court pointed out that having rejected the doctor's conclusion, the ALJ could not reasonably rely on her testimony without providing explanation for why he gave it some credit. *Id.* at *13 (concluding the ALJ "failed to adequately explain his findings"). And the court in *Baskin* found issue in that the ALJ's discussion of the state agency physician's opinion was "completely lacking in specificity or analysis." 2013 WL 1149597, at *17 ("[The ALJ] did not explain which portions of their opinions he credited and which portions he discounted or the reasons for the weight given.").

Neither apply here. When evaluating Mr. Lauffenburger's opinion, the ALJ did not make conflicting conclusions that would require additional explanation. And, as explained above, the

14

ALJ's evaluation cannot be considered completely lacking in specificity or analysis. After consideration, the ALJ found that the "record does support finding some limitations" but "not to the extent suggested by Mr. Lauffenburger." (R. at 1029). The ALJ incorporated several restrictions related to Plaintiff's mental status in the RFC. (*See* R. at 1013 (limiting Plaintiff to performing simple, routine tasks; superficial contact with coworkers and supervisors (defined as able to receive simple instructions, ask simple questions, and receive performance appraisals but not able to engage in more complex social interaction); no interactions with the public; no jobs involving teamwork; and only occasional changes to a routine work setting)). Importantly, "the ALJ was not required to provide a limitation-by-limitation discussion" of Mr. Lauffenburger's opinion. *Winner v. Comm'r of Soc. Sec.*, No. 1:19-CV-2348, 2020 WL 4734756, at *11 (N.D. Ohio Aug. 13, 2020).

In the end "[t]he Court reviews the ALJ's opinion as a whole, and the regulations distinguish between what an ALJ must consider and what he or she must explain." *Miller*, 2016 1060357, at *10 (citing *Hill v. Commissioner*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting an ALJ must "generally" explain the weight given to opinions for other sources)). And the ALJ "was required to provide only enough explanation to allow a subsequent reviewer, reading the decision as a whole and with common sense, to understand the weight he gave these opinions and the reasons for that weight." *Winner*, 2020 WL 4734756, at *11. When read as a whole, the Undersigned can adequately trace the ALJ's reasoning and consideration of Mr. Lauffenburger's opinion. Accordingly, the Undersigned finds no error that requires remand.

15

### B. Irene Dirksend's Opinion

The Undersigned finds the ALJ's treatment of Ms. Dirksend's opinion similarly sufficient. Like Mr. Lauffenburger, the ALJ noted that Ms. Dirksend was not an acceptable medical source. (R. at 1031). Plaintiff again does not contest this designation. (*See generally* Doc. 8).

The ALJ gave partial weight to Ms. Dirksend's March 2023 opinion. (R. at 1031 (citing R. at 1594–97)). He first observed several alterations she made on the checklist-type form. For instance, the ALJ noted that Ms. Dirksend initially opined Plaintiff would be absent twice per month due to his impairments or treatment but then changed her answer to three times per month. (*Id.* (citing R. at 1595)). She also opined that Plaintiff would experience "mild" limitations in several areas related to mental impairment, before changing them to "extreme." (*Id.* (citing R. at 1596–97)). The ALJ also highlighted that Ms. Dirksend declined to give an opinion related to off-task time. (*Id.* (citing R. at 1596–97)). The ALJ ultimately concluded that this opinion was not sufficiently explained because Ms. Dirksend did not clarify why she altered her opinion or provide support for such extreme limitations beyond a checklist of reported symptoms. (*Id.*). The ALJ also found that the opinion was not consistent with the record—including Ms. Dirksend's own treatment notes—which showed "cooperative behavior with adequate cognitive abilities, including with respect to attention, concentration, memory, abstraction, insight, and judgment." (R. at 1031; *see also* R. at 1022 (citing *e.g.*, R. at 338, 406–07, 439–40, 551, 1575)). The ALJ acknowledged Plaintiff's mood abnormalities but found no more than moderate limitations. (R. at 1031). The ALJ also found that Plaintiff did not require the level of absenteeism Ms. Dirksend opined. (*Id.*). Still, recognizing Plaintiff's "longstanding treatment history, including with Ms. Dirksend," the ALJ found some mental restrictions supported. (*Id.*).

16

Plaintiff again asserts that the ALJ's failure to more specifically explain his "partial weight" treatment of Ms. Dirksend's opinion is reversible error—particularly in light of her opinion that he would miss work at least twice per month. (Doc. 8). But again, the ALJ adequately addressed the opinion's supporting explanations and highlighted the conclusions' inconsistency with the rest of the record. (R. at 1031). And considering those, the ALJ found no more than moderate limitations appropriate. (*Id.*). Still, the ALJ noted Plaintiff's mood abnormalities and his longstanding treatment history with Ms. Dirksend before assigning the opinion partial weight. (*Id.*). Then, as discussed above, the ALJ incorporated several limitations in Plaintiff's RFC related to his mental status. (R. at 1013).

Ultimately, the ALJ's treatment of Ms. Dirksend's opinion provides an adequate explanation. It is not inexplicably conflicting nor devoid of analysis. It allows the Undersigned to "understand the weight he gave these opinions and the reasons for that weight." *Winner*, 2020 WL 4734756, at *11. No more is required.

C. **State Agency Psychological Consultants**

Finally, Plaintiff finds fault with the ALJ's treatment of Drs. Tangeman and Haskins' opinions, arguing that the ALJ impermissibly excluded a limitation in Plaintiff's RFC related to his "severe social withdrawal or isolation." (Doc. 8 at 7–8). More specifically, says Plaintiff, the state agency psychologists opined that Plaintiff would work best in a solitary setting, which is consistent with other opinions in the record such as those of Dr. Lauffenburger and Dr. Boerger. (*Id.*).

The ALJ first summarized Dr. Tangeman's opinion, including that he opined Plaintiff had marked limitations in social functioning and moderate limitations in concentrating, persisting, and maintaining pace. (R. at 1026–27 (citing R. at 119)). The ALJ further noted the doctor provided

17

various limitations related to Plaintiff's mental capacity. (R. at 1027(citing R. at 123–25)). The ALJ found the opinion only somewhat supported, referring to several other parts of the record that generally showed "adequate mental functioning for work activity within the limitations opined." (*Id.* (citing R. at 115, 136, 378, 406, 439–40, 453, 460, 508 1576)). Additionally, as discussed in more detail below, the ALJ found that Dr. Tangeman's opinion that Plaintiff "would perform best in a solitary setting" used preferential language and was otherwise unnecessary. (*Id.* (citing R. at 124)). The ALJ then went on to address Dr. Haskins's reconsideration opinion—which noted changes in Plaintiff's condition and the listings. (R. at 1027–28 (citing R. at 142–45)). The ALJ's evaluation of the reconsideration is otherwise markedly similar to his evaluation of Dr. Tangeman's opinion. (*Compare* R. at 1028 *with* R. at 1026–27). He ultimately gave partial weight to both. (R. at 1028 (but noting more weight was given to Dr. Haskins's reconsideration opinion)). And he substantially adopted most of the reviewers' opined limitations after accounting for vague and vocationally undefined language. (*Compare e.g.*, R. at 143–44 (opining Plaintiff can make simple decisions and carry out uncomplicated multi-step tasks in a setting without a fast pace; can have superficial social interaction with coworkers and supervisors but should avoid contact with the public; and can adapt to routine responsibilities in a setting where changes are infrequent) *with* R. at 1013 (Plaintiff's RFC)).

To the extent that Plaintiff finds fault with the ALJ's rejection of the state agency doctors' opinions that Plaintiff "would perform best in a solitary setting" (R. at 124, 144), the ALJ adequately explained his reasons. The ALJ found that the "opinion[s] related to a solitary setting reflect[] a preference as opposed to a vocational necessity, as it demonstrates that he would work best in such a setting as opposed to being unable to work without a solitary setting, and the residual functional capacity addresses the most, and not the least, a claimant is able to do." (R. at 1027).

18

The ALJ additionally found this limitation was inconsistent with Plaintiff's social activities described throughout the record that demonstrated "an isolated work environment is not necessary." (R. at 1027 (citing R. at 115, 136, 378, 406, 453, 460, 508)).

Rejecting an isolated work environment limitation in light of the opinions' preferential language was well within the ALJ's discretion. *Cf. Legette v. Comm'r of Soc. Sec.*, No. 5:20-CV-2709, 2022 WL 958130, at *8 (N.D. Ohio Feb. 25, 2022) (finding an ALJ's rejection of a preference for work in a solitary work environment was not an error where the doctor did not opine that the plaintiff must work in a solitary environment), *report and recommendation adopted sub nom. Legette v. Kijakazi*, No. 5:20-CV-02709, 2022 WL 952636 (N.D. Ohio Mar. 30, 2022); *see also* 20 C.F.R. § 404.1545(a)(1) (defining "residual functional capacity" as the most a plaintiff can do despite their limitations). And though Plaintiff argues that other opinions in the record are consistent with a limitation to an isolated work environment (Doc. 8 at 8 (citing R. at 398, 408)), the ALJ cited other records demonstrating Plaintiff's social activities and indicating "an isolated work environment is not necessary" (R. at 1027). Rather than "play[ing] doctor" as Plaintiff suggests (*id.*), the ALJ weighed the evidence and explained his rejection of this limitation.

Even if the Undersigned believed enough evidence existed to demonstrate Plaintiff's inability to work, as Plaintiff argues, the ALJ's decision may not be reversed simply because record evidence supports a different conclusion. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1996). Because it is the ALJ's "function to resolve conflicts in the evidence," and that is what the ALJ did here, the Undersigned finds that substantial evidence supports the decision. *See Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017). Accordingly, remand is not warranted.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: January 9, 2026

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE